No. 24-60420

# United States Court of Appeals for the Fifth Circuit

FLORIDA GAS TRANSMISSION COMPANY, LLC, A SUBSIDIARY OF
ENERGY TRANSFER LP,

*Petitioner,*

*versus*

UNITED STATES DEPARTMENT OF TRANSPORTATION; PIPELINE AND
HAZARDOUS MATERIALS SAFETY ADMINISTRATION; OFFICE OF
PIPELINE SAFETY,

*Respondents.*

On Petition for Review of an Order of
the Department of Transportation, NTSB
Agency No. 4-2022-032-NOPV

## OPENING BRIEF FOR PETITIONER

William V. Murchison
Vince.Murchison@PipelineLegal.com
Haley O'Neill
Haley.Oneill@pipelinelegal.com
Roina Rivera Baker
Roina.Baker@PipelineLegal.com
MURCHISON O'NEILL, PLLC
325 N. St. Paul Street, Suite 2700
Dallas, Texas 75201
Telephone: (214) 716-1923
Facsimile: (844) 930-0089

Dana Livingston
dlivingston@cokinoslaw.com
COKINOS YOUNG, P.C.
900 S. Capital of Texas Hwy.,
Suite 425
Austin, Texas 78746
Telephone: (512) 482-9304
Facsimile: (512) 610-1184

*Counsel for Petitioner Florida Gas Transmission Company, LLC,*
*a subsidiary of Energy Transfer LP*

No. 24-60420

_____

Florida Gas Transmission Company, LLC, a subsidiary of Energy Transfer LP,

*Petitioner*,

*versus*

United States Department of Transportation; Pipeline and Hazardous Materials Safety Administration; Office of Pipeline Safety,

*Respondents.*

_____

### Certificate of Interested Persons
_____

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may exercise possible disqualification or recusal.

| Petitioner: | Florida Gas Transmission Company, LLC, a subsidiary of Energy Transfer LP |
| --- | --- |
| Counsel for Petitioner: | Dana Livingston<br>dlivingston@cokinoslaw.com<br>Cokinos Young, P.C.<br>900 S. Capital of Texas Hwy.<br>Suite 425<br>Austin, TX 78746<br>Telephone: (512) 482-9304<br>Facsimile: (512) 610-1184 |

| | |
|---|---|
| | William V. Murchison<br>Vince.Murchison@PipelineLegal.com<br>Haley O'Neill<br>Haley.Oneill@pipelinelegal.com<br>Roina Rivera Baker<br>Roina.Baker@PipelineLegal.com<br>MURCHISON O'NEILL, PLLC<br>325 N. St. Paul Street, Suite 2700<br>Dallas, Texas 75201<br>Telephone: (214) 716-1923<br>Facsimile: (844) 930-0089 |
| **Other Interested Persons:** | FGT is owned by Citrus Corporation—a joint venture between Energy Transfer LP and Kinder Morgan, Inc. |
| **Respondents:** | U.S. Department of Transportation<br>Pipeline and Hazardous Materials Safety Administration<br>Office of Pipeline Safety |
| Counsel for Respondents: | Brian James Springer<br>brian.j.springer@usdoj.gov<br>Casen B. Ross<br>casen.ross@usdoj.gov<br>U.S. DEPARTMENT OF JUSTICE<br>CIVIL DIVISION, APPELLATE SECTION<br>950 Pennsylvania Avenue, N.W.<br>Room 7270<br>Washington, DC 20530<br>(202) 514-1923 |

*s/ Dana Livingston*
Dana Livingston
*Attorney of Record for Petitioner*

**STATEMENT REGARDING ORAL ARGUMENT**

This appellate proceeding involves the complex and highly technical regulations governing interstate pipelines that transport natural gas. Oral argument is likely to help the Court evaluate the parties' arguments in the context of those complex regulations.

# Table of Contents

Certificate of Interested Persons ...................................................... i

Statement Regarding Oral Argument ............................................. iii

Table of Contents ................................................................... iv

Table of Authorities .............................................................. vii

Jurisdictional Statement ........................................................... 1

Statement of Issues Presented for Review ..................................... 2

Statement of the Case ............................................................... 3

    A.    Factual background .................................................. 3

        1.    The parties ............................................... 3

        2.    The Sanford Lateral rupture incident ................. 3

    B.    Relevant procedural background ................................ 4

    C.    Rulings presented for review .................................... 5

Summary of the Argument ......................................................... 7

Standard of Review ................................................................ 10

    A.    PHMSA's misreading of its own regulations is entitled to no deference ............................................................ 11

    B.    The Court conducts plenary review of whether agency action violates due process and offends fair notice ...................... 13

    C.    Penalty amounts are reviewed for whether they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ......................................................... 13

ARGUMENT .................................................................. 14

I.   The Item 1 violation found by PHMSA represents an unlawful exercise
     of agency power ......................................................... 14

     A.   Regulatory backdrop ................................................ 15

     B.   PHMSA's enforcement action ignores the overarching statutory
          and regulatory scheme and implicates fair-notice concerns .............. 19

     C.   MAOP was historically established for the Sanford Lateral .............. 21

          1.   1959 .......................................................... 23

          2.   1975 .......................................................... 24

          3.   1975–1989 ..................................................... 25

     D.   FGT established MAOP under section 192.619(a)(3) ...................... 25

     E.   FGT also established MAOP under the alternate method
          provided for in subsection (c) ...................................... 27

II.  The Item 3 violation found by PHMSA represents an unlawful exercise
     of agency power ......................................................... 28

     A.   In finding a violation for FGT's 2019 tool run, PHMSA misreads
          the regulations ..................................................... 28

          1.   Technical background .......................................... 29

          2.   PHMSA's section 192.937(c)(1) tool-selection violation
               incorrectly bypasses the threat-identification
               determination that must be made as the threshold .............. 31

     B.   PHMSA's section 192.937(c) analysis is blocked by precedent ......... 36

1. Section 192.937(c)'s "threats to which the covered segment is susceptible" language creates an if-and-only-if condition.................................................36

2. Nothing in Part 192 compels the conclusion that LF-ERW pipe is deemed *per se* susceptible to selective-seam-weld corrosion.................................................39

C. PHMSA's finding that section 192.917(e)(4)'s language was satisfied isn't supported by evidence this Court can credit................41

D. The challenged violations depend on regulatory interpretations that offend due process and fair notice ...............................................46

III. Independently, the final order offends due process in two more ways ........ 48

A. PHMSA considered materials outside the agency record.................48

B. PHMSA's refusal to produce the civil-penalty worksheet in Excel also deprived FGT of due process ..........................................50

IV. The civil penalty for Item 3 is excessive because it was increased based on an unsupported causal relationship with the incident .............................55

CONCLUSION ..................................................59

CERTIFICATE OF SERVICE ..................................... 61

CERTIFICATE OF COMPLIANCE ..................................62

# Table of Authorities

**Page(s)**

## Cases

*Allred's Produce v. U.S. Dep't of Agric.*,
178 F.3d 743 (5th Cir. 1999) ........................................................... 10

*Anthony v. United States*,
520 F.3d 374 (5th Cir. 2008) ........................................................... 31

*Arlington v. FCC*,
569 U.S. 290 (2013) ........................................................................ 12

*Auer v. Robbins*,
519 U.S. 452 (1997) ............................................................. 11-12, 46

*Bowles v. Seminole Rock & Sand Co.*,
325 U.S. 410 (1945) ................................................................... 11-12

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) ........................................................................ 20

*Copeland v. C.I.R.*,
290 F.3d 326 (5th Cir. 2002) ........................................................... 31

*Diamond Roofing Co. v. OSHRC*,
528 F.2d 645 (5th Cir. 1976) ........................................................... 20

*Don Ray Drive-A-Way Co v. Skinner*,
785 F. Supp. 198 (D.D.C. 1992) .................................................. 53-54

*In re El Paso Natural Gas Co.*,
Final Order, CPF No. 4-2019-1010, 2020 WL 6870722 (DOT July
22, 2020) ........................................................................................ 20

*Env't Integrity Project v. EPA*,
969 F.3d 529 (5th Cir. 2020) ........................................................... 11

*ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*,
867 F.3d 564 (5th Cir. 2017) ....................... 8, 13, 19, 21, 30, 36-41, 45

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)...................................................... 13, 19, 46

*Kisor v. Wilkie*,
588 U.S. 558 (2019) ...........................................................11-12

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ................................................................ 12

*Luminant Generation Co. v. EPA*,
675 F.3d 917 (5th Cir. 2012) ............................................... 10

*Pension Benefit Guar. Corp. v. Wilson N. Jones Mem'l Hosp.*,
374 F.3d 362 (5th Cir. 2004) ....................................... 10, 45

*Rodriguez de Quijas v. Shearson/Am. Exp.*,
490 U.S. 477 (1989) .............................................................. 12

*Texas v. EPA*,
829 F.3d 405 (5th Cir. 2016) ............................................... 10

*United States v. Williams*,
553 U.S. 285 (2008) ............................................................... 47

*In re W. Tex. Gas, Inc.*,
Final Order, CPF No. 4-2004-1007, 2006 WL 8407362 (DOT
Sept. 13, 2006) ...................................................................... 22

## Statutes, Rules, and Constituional Provisions

5 U.S.C. § 706.............................................................................. 10

5 U.S.C. § 706(2) ..................................................................10, 51

49 U.S.C. § 5127(a).................................................................... 1

49 U.S.C. § 60102(a)(2)............................................................ 36

49 U.S.C. § 60117 ...................................................................... 1

49 U.S.C. § 60117(b)(1) ...............................................49-51, 55

49 U.S.C. § 60119(a)(1) ............................................................. 1

49 U.S.C. § 60119(a)(3) ............................................................... 10

49 U.S.C. § 60122(b) ................................................................... 55

49 U.S.C. § 60139 ....................................................................... 17

5ᴛʜ Cɪʀ. R. 30.2 ........................................................................ 52

5ᴛʜ Cɪʀ. R. 32.1 ........................................................................ 62

Fᴇᴅ. R. Aᴘᴘ. P. 17(b)(1)(B) ...................................................... 52

Fᴇᴅ. R. Aᴘᴘ. P. 28(f) ................................................................ 16

Fᴇᴅ. R. Aᴘᴘ. P. 32(a)(4) ............................................................ 53

Fᴇᴅ. R. Aᴘᴘ. P. 32(a)(5) ............................................................ 62

Fᴇᴅ. R. Aᴘᴘ. P. 32(a)(6) ............................................................ 62

Fᴇᴅ. R. Aᴘᴘ. P. 32(a)(7)(B) ....................................................... 62

Fᴇᴅ. R. Aᴘᴘ. P. 32(f) ................................................................ 62

Natural Gas Pipeline Safety Act of 1968, Pub. L. 90-481, 49 Stat. 543
(Aug. 12, 1968) ..................................................................... 15

Pipeline Safety Regulatory Certainty, and Jobs Creation Act of 2011,
Pub. L. 112-90, 125 Stat. 1904 (Jan. 3, 2012) (codified at 49 U.S.C.
§ 60139) ........................................................................... 17, 19

U.S. Cᴏɴsᴛ. amend. V .......................................................... 46, 49

## Regulations and Regulatory Materials

49 C.F.R. pt. 192 ................................................ 15, 21, 31, 35-40, 57

49 C.F.R. pt. 192 subpt. O. ..................................................... 37

49 C.F.R. pt. 195 ............................................................ 36-37, 39-40

49 C.F.R. § 190.209 ........................................................... 44, 48-49

49 C.F.R. § 190.211(g) ........................................................ 44, 48-49

49 C.F.R. § 192.7 ...................................................................................31, 38

49 C.F.R. § 192.303 ........................................................................... 57

49 C.F.R. § 192.607 ........................................................................... 24

49 C.F.R. § 192.611 ........................................................................... 27

49 C.F.R. § 192.619................................................... 4-5, 14-15, 19, 21

49 C.F.R. § 192.619(a) ....................................................7, 15-16, 25-27, 34

49 C.F.R. § 192.619(a)(1) ................................................................... 26

49 C.F.R. § 192.619(a)(2) ............................................................. 15, 26

49 C.F.R. § 192.619(a)(3).........................................2, 4-5, 14-15, 19-20, 22-23, 25-27

49 C.F.R. § 192.619(a)(4) ............................................................. 16, 26

49 C.F.R. § 192.619(c) ............................................... 2, 7, 16, 25, 27

49 C.F.R. § 192.624 ................................................... 2, 18, 20-21

49 C.F.R. § 192.717 ........................................................................... 43

49 C.F.R. § 192.903 ...............................................................4, 37, 57

49 C.F.R. § 192.917................................................ 31, 32, 34-36, 38-40

49 C.F.R. § 192.917(a) ................................................................. 32-33

49 C.F.R. § 192.917(d) ....................................................................30

49 C.F.R. § 192.917(e)(3) ..................................................................42

49 C.F.R. § 192.917(e)(4).................................... 8, 31, 33-35, 39-43, 45, 47

49 C.F.R. § 192.921(a) ....................................................................... 34

49 C.F.R. § 192.931...................................................................31, 38

49 C.F.R. § 192.933(d) ...................................................................... 43

49 C.F.R. § 192.937.............................................. 17, 28, 31-32, 35, 37, 40

49 C.F.R. § 192.937(c) ................................ 8, 31-32, 34-36, 38-40, 45, 57

49 C.F.R. § 192.937(c)(1) ........................ 2, 4, 6, 8, 30-32, 34, 36, 47, 57-58

49 C.F.R. § 195.2 .......................................................................... 25, 30

49 C.F.R. § 195.303(d) ......................................................................40

49 C.F.R. § 195.452........................................................................ 36-37

49 C.F.R. § 195.452(c)(1) ...................................................................... 37

49 C.F.R. § 195.452(j)(5) ................................................................... 37-39

Extension of Time for Confirmation or Revision of MAOP, 36 Fed.
    Reg. 18,194 (Sept. 10, 1971).........................................................24

PHMSA Order Approving GasTransmission Pipeline Safety Rule
    Changes: MAOP Reconfirmation, Expansion of Assessment
    Requirements, and Other Related Amendments, 84 Fed. Reg.
    52,180 (Oct. 19. 2019) (codified at, *inter alia*, 49 C.F.R. §
    192.917(e)(4)) .......................................................................17-18, 42

Pipeline Safety: Safety of Gas Transmission and Gathering Pipelines,
    81 Fed. Reg. 20,722 (proposed Apr. 8, 2016) .................................... 41

Transportation of Natural and Other Gas by Pipeline: Minimum
    Federal Safety Standards, 49 Fed. Reg. 13,248 (Aug. 19, 1970)
    (codified at 49 C.F.R. pts. 190, 192) ........................................... 15-16

## Jurisdictional Statement

A.     The basis for the Pipeline and Hazardous Materials Safety Administration's (PHMSA's) subject-matter jurisdiction over Petitioner as the owner of natural gas transmission pipelines—including jurisdiction to conduct a pipeline safety enforcement civil penalty matter—is 49 U.S.C. § 60117.

B.     This court has jurisdiction to review "a final action" of PHMSA.  49 U.S.C. § 5127(a); *see also* 49 U.S.C. § 60119(a)(1) ([A] person adversely affected by . . . an order issued under this chapter may apply for review of the . . . order by filing a petition for review . . . in the court of appeals of the United States for the circuit in which the person . . . has its principal place of business.").

C.     The Petition for Review—seeking to review PHMSA's final order issued May 21, 2024—was timely filed on August 16, 2024 (87 days after the May 21st final order, A.2925-41).  *See* 49 U.S.C. § 60119(a)(1) ("The petition must be filed not later than 89 days after the regulation is prescribed or order is issued.").

D.     This petition is from a final agency order:  PHMSA issued its final order May 21, 2024.  A.2925-41.  The final order constitutes final agency action.

1.    Did PHMSA improperly conclude that Florida Gas Transmission Company, LLC (FGT) violated 49 C.F.R. § 192.619(a)(3) by failing to establish a maximum allowable operating pressure (MAOP) for its Sanford Lateral?

    a.    Despite FGT's production of a record of the established MAOP, did FGT fail to provide records to substantiate its MAOP determination?

    b.    Was FGT's establishment of MAOP also valid under section 192.619(c)'s grandfather clause?

    c.    Did PHMSA's conclusion conflict with section 192.624's provision to address an industry-wide issue with lack of traceable, verifiable, and complete records for older pipelines and that gives operators until 2035 to reconfirm historical MAOP or to re-establish MAOP?

2.    Did PHMSA improperly conclude that FGT's choice of an internal-inspection tool for a 2019 tool run violated the pipeline-integrity-management regulations in 49 C.F.R. § 192.937(c)(1)?

3.    Are the violations found by PHMSA, and its actions in this proceeding, improper because they violate due process and offend the requirement of fair notice?

4.    Based on a non-existent causal relationship between FGT's 2019 tool selection and the Sanford Lateral rupture, was the civil penalty for Item 3 excessive?

## Statement of the Case

### A. Factual background

#### 1. The parties

Petitioner, Florida Gas Transmission Company, LLC (FGT), is a large natural gas pipeline company that operates gas transmission pipelines that originate in Galveston Bay and extend through various states, including Florida. A.2925 n.1.[1] The pipelines carry about half of the natural gas used in the entire state of Florida.[2]

To help maintain the safe operation of pipelines, in 1968 Congress created the Office of Pipeline Safety (OPS), which is now under the Pipeline and Hazardous Materials Safety Administration (PHMSA), as part of the Department of Transportation. The three (collectively, PHMSA) are Respondents in this review proceeding.

#### 2. The Sanford Lateral rupture incident

On September 10, 2020, a 15.97-mile long segment of FGT's pipeline—the Sanford Lateral constructed in 1959—ruptured in Sanford, Florida. A.721-92, 1172, 2925. As PHMSA's final order would later reflect, "The escaping natural gas ignited and burned an area measuring approximately 515 feet by 100 feet." A.2925.

---

[1] The Appendix containing the agency record will be cited as "A.___," the Record Excerpts as "RE.__:_," and a regulatory addendum as "Add.___."

[2] https://bit.ly/3E14mUq

The rupture was not in what the regulations classify as a "high consequence area." A.728; *see* 49 C.F.R. § 192.903. No injuries or fatalities resulted. A.2925.

PHMSA responded to FGT's report of the incident, conducting an on-site pipeline safety inspection and investigation of the facilities and records of the Sanford Lateral. A.2925. And shortly after the incident, PHMSA issued a Corrective Action Order (CAO) that required the Sanford Lateral to stay shut down pending repair, a records review and verification, a review of prior inline-inspection results, a metallurgical laboratory examination of the ruptured pipe, a root cause failure analysis, a pressure restriction upon restart, and a remedial work plan. A.2925. Under PHMSA's oversight, FGT repaired the pipeline at the rupture site and, under the CAO, returned it to service after a few months. A.2925.

## B. Relevant procedural background

After PHMSA's inspection and investigation into the rupture, PHMSA issued a Notice of Probable Violation. The Notice proposed that FGT committed three regulatory violations, two of which are relevant in this review proceeding:

Item 1.    49 C.F.R. § 192.619 by failing to establish an MAOP for its Sanford Lateral in accordance with 49 C.F.R. § 192.619(a)(3).

Item 3.    49 C.F.R. § 192.937(c)(1) by failing to follow ASME/ANSI B31.8S, section 6.2 in selecting appropriate in-line inspection tools for the 2019 tool run.

A.11-12, 13-14.

4

FGT contested the allegations and requested a hearing. A.353-54. As is customary for PHMSA hearings, the hearing's presiding official is from PHMSA itself. A.2224. Near the hearing's conclusion, the presiding official declared that the hearing record would close once FGT filed its post-hearing submission. A.2558. After FGT filed its post-hearing submission and the record closed, the Director of PHMSA's Southwest Region submitted a recommended decision. A.2803-18. That recommendation, though, included references to materials that weren't in the case file, weren't submitted during the hearing, and weren't submitted before the record closed. *See, e.g.*, A.2803-18, 2558.

Following the post-hearing submissions, PHMSA issued a final order. It too relied on materials outside the case file. A.2925-41. In it, PHMSA withdrew Item 2 as unsupported, A.2930-33, but found that FGT had violated two regulations—Item 1, A.2926-30, and Item 3, A.2933-37. It assessed two civil penalties—$46,600 for Item 1, and $362,800 for Item 3. A.2937-41. This review proceeding followed.

## C.    Rulings presented for review

Four rulings in the final order are presented for review. First, on Item 1, PHMSA ruled that FGT violated 49 C.F.R. § 192.619 by failing to establish an MAOP for its Sanford Lateral under 49 C.F.R. § 192.619(a)(3). A.2930.

Second, on Item 3, PHMSA also found that FGT violated 49 C.F.R. § 192.937(c)(1) in connection with FGT's tool selection for a 2019 tool run. A.2937.

Third, in finding these violations, over FGT's objections, PHMSA considered and expressly relied on materials outside the agency case file. A.2934-36 & nn.36-37,40, 44-45.

Fourth, in imposing the $46,600 and $362,800 penalties, PHMSA calculated them using formulas in an Excel spreadsheet called the civil-penalty worksheet. A.2939-41. Yet PHMSA refused to produce the native Excel version of that worksheet that would've enabled FGT to fully understand how PHMSA was calculating the penalties it proposed and to effectively prepare for and question witnesses and defend FGT at the agency hearing. The final order rejects FGT's arguments that PHMSA's refusal to produce the Excel version of that worksheet violated due process. A.2939-41.

And fifth, the civil penalty imposed for Item 3 is excessive because it was increased based on an unsupported causal relationship with the incident.

## SUMMARY OF THE ARGUMENT

**Item 1—Establishment of MAOP.**  PHMSA concluded that FGT violated section 192.619(a) because, in the agency's view, FGT didn't have records to substantiate the highest actual operating pressure to which the Sanford Lateral was subjected in the five years preceding July 1, 1970.  But PHMSA's conclusion as to Item 1 doesn't fit the regulation.  It isn't faithful to precedent.  And it doesn't serve the purpose at the core of the MAOP reconfirmation statutory directives and regulations to address industry-wide issues with incomplete records—giving pipeline operators until as late as 2035 to reconfirm their MAOP.

Even then, FGT showed that MAOP was established in 1959 and in 1975, then again between 1975 and 1989; that MAOP, at the date of the incident, was established at 713 psig; and that the so-called Enron "Gold Sheet" is a valid recordation of conclusions drawn from the review of additional records establishing MAOP under section 192.619(c)'s grandfather clause, if not also under section 192.619(a) itself.

At a minimum, given the promulgation of the MAOP reconfirmation provision and the multi-year run up to its adoption, FGT was deprived of fair notice that PHMSA intended to disregard the decades-old establishment of MAOP and the compliance deadline as late as 2035 for reconfirmation.  *See infra* Section I.

**Item 3—Tool selection.** PHMSA concluded that FGT violated section 192.937(c)(1) in FGT's choice of internal-inspection tools for a 2019 tool run because, PHMSA says, the LF-ERW pipe of which the Sanford Lateral is made is susceptible to selective-seam-weld corrosion. PHMSA dances between saying that such pipe is automatically deemed susceptible to that type of corrosion—though the text and structure of the regulations, including section 192.917(e)(4), tell a different story—and saying that the Sanford Lateral was susceptible because of a history of "seam failures"—though the evidence the final order cites for that proposition isn't evidence of seam failures and cannot be credited in any way.

In the end, PHMSA's complaint about FGT's 2019 tool choice never gets out of the starting gate. This Court's precedent in *ExxonMobil* already construed language like that here as creating an if-and-only-if condition requiring a threshold determination. But PHMSA's analysis erroneously bypasses the threat-identification determination that must be made as the threshold before section 192.937(c)'s tool-selection provision even becomes relevant.

Because PHMSA's tool-selection conclusion hinges on PHMSA's misreading sections 192.937(c) and 192.917(e)(4), on evidence this Court cannot credit, and giving no credence to *ExxonMobil*, Item 3 should be vacated. *See infra* Section II.

**Due process.**  Aside from the fair-notice problems resulting from PHMSA's textually unfaithful reading of its regulations for Items 1 and 3, the final order offends due process in two more ways.  The final order shows that PHMSA considered materials outside the agency case file and outside the record.  Worse, it stretches the import of those extra-record documents beyond the weight they can bear—all without giving FGT an opportunity to defend against them at the hearing.  The due-process problems plaguing the final order also include PHMSA's refusal to produce its civil-penalty worksheet in its native Excel format.  Without it, FGT couldn't access the algorthims PHMSA used to assess civil penalties.  That falls well short of what due process demands.  *See infra* Section III.

**Penalty amount**.  PHMSA's penalty calculation for Item 3 was premised in part on a causal relationship between FGT's 2019 tool selection and the Sanford Lateral rupture.  But that causal relationship was non-existent.  PHMSA's error, though, caused it to increase the proposed penalty for Item 3, so the assessed penalty, even if Item 3 were to be affirmed, should be reduced.  *See infra* Section IV.

The standard of review for the agency's final order is prescribed by the Administrative Procedure Act, 5 U.S.C. § 706. *See* 49 U.S.C. § 60119(a)(3). Under the APA, the reviewing court shall hold unlawful and set aside certain categories of agency action, findings, and conclusions, including those found to be:

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law;
>
> (B) contrary to constitutional right, power, privilege, or immunity; [or]
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

5 U.S.C. § 706(2); *see Allred's Produce v. U.S. Dep't of Agric.*,178 F.3d 743, 746 (5th Cir. 1999). "Arbitrary and capricious review focuses on whether an agency articulated a rational connection between the facts found and the decision made." *Pension Benefit Guar. Corp. v. Wilson N. Jones Mem'l Hosp.*, 374 F.3d 362, 366 (5th Cir. 2004). The reviewing court "must disregard any post hoc rationalizations of the [agency]'s action and evaluate it solely on the basis of the agency's stated rationale at the time of its decision." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 925 (5th Cir. 2012).

Even under the arbitrary-and-capricious standard, legal conclusions are reviewed *de novo*. *Texas v. EPA*, 829 F.3d 405, 425 (5th Cir. 2016). Because the lead

issues here involve the agency's interpretation of Congressional mandates and regulatory text, below we provide an expanded discussion of the review standard.

## A. PHMSA's misreading of its own regulations is entitled to no deference.

In deciding whether to defer to the agency's interpretation of its own regulations, this Court applies the framework set out in *Kisor v. Wilkie*, 588 U.S. 558 (2019), concerning what's commonly known as *Auer/Seminole Rock* deference. *See Env't Integrity Project v. EPA*, 969 F.3d 529, 540 n.6 (5th Cir. 2020) (citing *Kisor*, *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945), and *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).

*Auer* deference "can arise only if a regulation is genuinely ambiguous." *Kisor*, 588 U.S. at 573. A regulation can be deemed "genuinely ambiguous" only if—"after a court has resorted to all the standard tools of interpretation," including consideration of the "text, structure, history, and purpose of a regulation"—uncertainty exists. *Id.* at 573, 575. "If uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means—and the court must give it effect, as the court would any law." *Id.* at 574-75. Thus, determining whether a rule is "genuinely ambiguous" is merely step one of the analysis. *Id.* at 573.

Even if a regulation is determined to be genuinely ambiguous, to be accorded deference "the agency's reading must fall 'within the bounds of reasonable interpretation.'" *Id*. at 576 (quoting *Arlington v. FCC*, 569 U.S. 290, 296 (2013)). In other words, the agency's interpretation of its regulation "must come within the zone of ambiguity" created by the regulation's ambiguous text. *Id*.

Still, *Kisor* warns that "not every reasonable agency reading of a genuinely ambiguous rule should receive *Auer* deference." A reviewing court must also "make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Id*. This inquiry ensures that courts defer only to those agency readings "that Congress would have wanted [them] to." *Id*.

Neither PHMSA nor FGT contended that any of the regulations at issue are genuinely ambiguous.[3] In reviewing PHMSA's final order finding that FGT violated them, this Court thus owes PHMSA's interpretation of those regulations no deference. *See infra* Sections I.–II.

---

[3] If the Court were to disagree, then we question—and expressly preserve—whether *Auer* remains good law in the wake of *Chevron*'s overruling in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). Unless and until the Supreme Court overrules *Auer*, *Seminole Rock*, and *Kisor*, we acknowledge this Court is bound to follow *Kisor*. *See Rodriguez de Quijas v. Shearson/Am. Exp.*, 490 U.S. 477, 484 (1989).

**B.** **The Court conducts plenary review of whether agency action violates due process and offends fair notice.**

This Court's review of whether agency action violates due process or offends fair notice is *de novo*. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see infra* Sections I.B., II.D and III.

**C.** **Penalty amounts are reviewed for whether they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.**

This Court reviews an agency's penalty determination under the arbitrary and capricious standard. *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 857 F.3d 564, 582 (5th Cir. 2017); *see infra* Section IV.

**ARGUMENT**

## I. The Item 1 violation found by PHMSA represents an unlawful exercise of agency power.

On Item 3, PHMSA found that FGT violated 49 C.F.R. § 192.619 by failing to establish a maximum allowable operating pressure (MAOP) for its Sanford Lateral under section 192.619(a)(3). A.2930. The crux of PHMSA's complaint is that FGT failed to provide records to substantiate its MAOP determination—in particular, records of the highest actual operating pressure on the Sanford Lateral during the five years preceding specific dates established by regulation.

To substantiate the Sanford Lateral's MAOP, FGT relied on what witnesses referred to as the "Gold Sheet." A.43 (RE.2:1); *see, e.g.*, A.2259, 2322, 2334, 2349. Premised on its rejection of the Gold Sheet and its insistence that more is required, PHMSA concluded that no MAOP was ever validly established for the Sanford Lateral until shortly after the incident. A.2926-30.

But PHMSA's determination fatally hinges on misreading the regulations and ignoring a Congressionally mandated, overarching statutory and regulatory regime for pipeline operators to reconfirm MAOP. FGT satisfies the requirements for establishing MAOP on four independent bases. This Court should thus vacate Item 1 of PHMSA's final order, along with the associated penalty.

To put the dispute in context, we begin with the regulatory background.

## A.     Regulatory backdrop

At the time the Sanford Lateral was constructed in 1959, A.1172, there were no gas pipeline safety regulations at all.  As a result, no federal regulatory requirements specified a method for determining MAOP, nor required that records supporting the MAOP determination be retained.  Federal regulation of gas pipeline safety began with the creation of the Office of Pipeline Safety (OPS) and passage of the Natural Gas Pipeline Safety Act of 1968.[4]  Then on August 19, 1970, OPS codified broad-based gas pipeline regulations setting minimum safety standards.[5]

Among them are rules for establishing MAOP.  In 1970, pipelines subject to Part 192 regulations had two options for establishing MAOP, both of which are found in section 192.619:  (1) 192.619(a), and (2) 192.619(c)'s "grandfather" clause.

*Section 192.619(a)*—Under subsection (a) paraphrased here, MAOP is limited to the lowest of four designated pressure values:

1.     Design basis of the pipe and its components, section 192.619(a);

2.     Pressure-test basis, section 192.619(a)(2);

3.     The 5-year highest actual operating pressure preceding July 1, 1970, section 192.619(a)(3); and

---

[4] Pub. L. 90-481, 49 Stat. 543 (Aug. 12, 1968).

[5] *See* Transportation of Natural and Other Gas by Pipeline:  Minimum Federal Safety Standards, 49 Fed. Reg. 13,248 (Aug. 19, 1970) (codified at 49 C.F.R. pts. 190, 192).

4. The maximum safe pressure determined by the operator considering the pipeline segment's material properties and its history, including known corrosion and operating pressure, section 192.619(a)(4).

*See* 49 C.F.R. § 192.619(a) (full text set out in Add.A—the regulatory addendum filed under Fᴇᴅ. R. Aᴘᴘ. P. 28(f)).

*Section 192.619(c)'s "grandfather" clause*: This clause, which remains in place today, provides an alternative method for initially establishing MAOP. It is solely based on the five-year highest operating pressure. *See* Add.A. As the regulation's history recounts, the clause was added because the Department does "not now have enough information to determine that existing operating pressures are unsafe" and "in view of the statements made by the Federal Power Commission" that there was "'no evidence that would indicate a material increase in safety would result from requiring wholesale reductions in the pressure of existing pipelines which have proven capable of withstanding operating pressures through actual operation.'" 49 Fed. Reg. at 13,248.

An event in 2010 changed the regulatory landscape. On September 9, 2010, a natural-gas pipeline in San Bruno California, operated by Pacific Gas & Electric Company (PG&E) ruptured and ignited, killing eight people, injuring fifty-eight

more, destroying thirty-eight homes and damaging seventy more homes.[6]   The

rupture motivated a comprehensive reexamination of gas transmission pipeline

safety and spurred Congress to enact the Pipeline Safety Regulatory Certainty, and

Jobs Creation Act of 2011.[7]

In it, Congress expressed the need for operators to evaluate their records to

ensure they accurately reflect the pipelines' physical and operational characteristics

and that they establish MAOPs.   49 U.S.C. § 60139(a)(2).   And where MAOP

records are incomplete, Congress directed PHMSA to develop a process for pipeline

owners or operators to reconfirm MAOP as quickly as economically feasible.   *Id.*

§ 60139(c)(1)(A).  Indeed, a records search required by the enactment "showed that

some pipeline operators do not have the records they need to substantiate the current

MAOP of their pipelines, as required under existing regulations, and lacked other

critical information needed to assess risks and threats and perform effective

---

[6] *See* PHMSA Order Approving Gas Transmission Pipeline Safety Rule Changes: MAOP Reconfirmation, Expansion of Assessment Requirements, and Other Related Amendments, 84 Fed. Reg. 52,247 (Oct. 19. 2019) [hereinafter cited in Section I of this Brief as "MAOP Reconfirmation History"] (codified at, *inter alia*, 49 C.F.R. § 192.937), *available at* A.986.

[7] Pub. L. 112-90, 125 Stat. 1904 (Jan. 3, 2012) ("PIPES 2011") (codified at 49 U.S.C. § 60139).

[integrity management]."[8]  PHMSA took eight years to develop a final rule for this requirement.[9]

Among PHMSA's first actions was to amend its annual reporting form for gas transmission pipelines to capture information about pipeline mileage for which operators had incomplete records.  A.2293, 2295-97.  FGT filed such reports starting in 2012.  A.1065-78, 1079-99, 1988-2021, 2295.

What began in 2011 after San Bruno culminated in 2019 with PHMSA's promulgation of new and revised regulations that set out a timeline for operators to remedy any issues of missing records to substantiate MAOP establishment.  The star of the resulting new MAOP reconfirmation regulations was 49 C.F.R. § 192.624.  *See* Add.B.  Section 192.624 provides six methods by which operators may reconfirm MAOP and provides two deadlines still off in the distance—one in 2028 and the other in 2035.[10]  *See* RE.4:1-4.  Yet in Item 1, PHMSA found FGT in violation of

---

[8] MAOP Reconfirmation History, 84 Fed. Reg. at 52,180.  *See generally* A.2291-98 (RE.3:1-8) (detailing the history of the pipeline safety program); A.722-31 (RE.7:1-10) (same).

[9] *See* MAOP Reconfirmation History, 84 Fed. Reg. at 52,180.

[10] MAOP for 50% of a given operator's subject pipeline segments must be reconfirmed by July 3, 2028, and the remaining 50% by July 2, 2035.  49 C.F.R. §§ 192.624(c)(1)-(6), 192.624(b)(1)-(2).  Alternatively, operators must complete reconfirmation "as soon as practicable, but not to exceed 4 years after the pipeline segment first meets a condition of § 192.624(a)," placing the earliest express deadline at October 1, 2023—more than a year after PHMSA issued its notice of probable violation here.  49 C.F.R. §§ 192.624(b)(2); A.9-15; *see* A.1172, 2925.

MAOP regulations because, in its view, FGT didn't have adequate records to substantiate the establishment of MAOP.  A.2926-30.

With this backdrop in mind, we turn to the four reasons why PHMSA's resolution of Item 1 gets it wrong.

## B. PHMSA's enforcement action ignores the overarching statutory and regulatory scheme and implicates fair-notice concerns.

PHMSA's finding that FGT violated 49 C.F.R. § 192.619 by failing to establish MAOP for the Sanford Lateral under section 192.619(a)(3) is difficult to square with the overarching statutory and regulatory scheme.  A.2930.  PHMSA faults FGT for having records that PHMSA knew to be incomplete.  A.1065-78, 1079-99, 1988-2021; *see* A.820-25, 828-45, 848-983, 986-1064, 1079-99.

But rather than allow FGT to proceed under the MAOP reconfirmation regime, PHMSA singles out one regulatory subsection for this enforcement action, effectively thumbing its nose at the Congressional directives of the 2011 PIPES Act.

This enforcement action also implicates fair notice.  Due process demands that agencies who regulate the conduct of others and subject them to civil and criminal sanctions "give fair notice of conduct that is forbidden or required." *Fox Television*, 567 U.S. at 253.  Fair notice requires agencies to state with "ascertainable certainty" what it meant by the standards it has promulgated. *ExxonMobil*, 867 F.3d at 578.  This rule requires that agency regulations that "allow monetary penalties

against those who violate them . . . must give [a party] fair warning of the conduct it prohibits or requires, and it must provide a reasonably clear standard of culpability to circumscribe the discretion of the enforcing authority and its agents." *Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976); *see Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 n.15 (2012).

Here, PHMSA made ample public statements about its intent to establish a regime that allowed MAOP reconfirmation over a 15-year period. It did so in advisory bulletins, public hearings, publishing advance notices of proposed rulemaking, notice of proposed rulemaking, and then in promulgating the final rule that was codified into section 192.624. A.723-24; *see* A.828-45 (ANPRM); A.848-983 (NPRM); A.986-1064 (final rule); A.787-92 (49 C.F.R. § 192.624).

And in other enforcement actions also alleging, as here, that the operator failed to establish MAOP under section 192.619(a)(3), while PHMSA found the violation supported, A.2928, it nevertheless permitted that operator to avail itself of section 192.624's reconfirmation process. *In re El Paso Natural Gas Co.*, Final Order, CPF No. 4-2019-1010, 2020 WL 6870722 (DOT July 22, 2020), *available at* A.1142-50. When asked at the hearing why El Paso Natural Gas was assessed no penalty for the MAOP records issue and was instead allowed to avail itself of section 192.624, PHMSA explained that there was no incident in the *El Paso* case, but that there was

one here.  A.2555-56.  There's nothing in the text of either section 192.619 or section 192.624 to suggests that an incident makes any difference.

On that score, the mere occurrence of an incident doesn't mean that there's been a violation.  *ExxonMobil*, 857 F.3d at 577-78 ("The unfortunate fact of the matter is that, despite adherence to safety guidelines and regulations, oil spills still do occur.").  Yet that appears to be the current running through PHMSA's approach to enforcement actions and its reading of the regulations—there was an incident, so FGT must have violated the regulations.  But that logic doesn't hold.

Among regulated pipelines, the promulgation and enforcement history points to one conclusion:  PHMSA expected that pipeline operators subject to Part 192 regulations who had incomplete MAOP records could remedy any incompleteness by specified dates.  Yet PHMSA charged FGT in disregard of Congress's reconfirmation directives and the regulations promulgated to fulfill those directives.

Item 1's finding is the poster child for agency action that's arbitrary and capricious.

## C.    MAOP was historically established for the Sanford Lateral.

PHMSA staked its case on Item 1 on its position that FGT "failed to submit any operating pressure records."  *See, e.g.*, A.12.  PHMSA has yet to explain what it means by "operating pressure records."  Even when asked, it couldn't point to

anything in the regulations' text expressly requiring "operating pressure records," instead admitting that PHMSA merely "infer[s] that they are required under .619(a)(3)." A.2261. That too falls well short of what fair notice demands—that PHMSA apprise regulated pipeline operators of what the regulations require with ascertainable certainty.

What PHMSA means by "operating pressure records" isn't even clear to begin with. Certainly, section 192.619(a)(3)'s text provides no clues. It reads that "[t]he highest actual operating pressure to which the segment was subjected during the 5 years preceding" July 1, 1970. "Operating pressure records" are mentioned nowhere. Nor has PHMSA defined in any rule or guidance the meaning of "operating pressure records." And PHMSA conceded that, while it must be able to verify MAOP, the regulations themselves "do not explicitly require Respondent to have records of the pressures used to establish MAOP." *In re W. Tex. Gas, Inc.*, Final Order, CPF No. 4-2004-1007, 2006 WL 8407362 (DOT Sept. 13, 2006).

A big problem is that "operating pressure records" could mean any number of things. They could be actual pressure readings, summaries of pressure readings, or compilations of pressure readings. Even then, they could take many forms, including paper records, electronic records, or paper records of electronic records.

And what about how often pressure readings are recorded? Pressure could be recorded by the minute, hourly, daily, monthly, yearly, and so on.

But section 192.619(a)(3) itself asks only for the *highest* actual operating pressure for the five years before July 1, 1970. That's not a series of every pressure during those five years. The highest such value is a single number. That's what the Gold Sheet provided. For its part, PHMSA presumes without basis that an analysis was not done. They have no evidence of it, even though it's their burden of proof to show that FGT didn't meet 49 C.F.R. § 192.619(a)(3). PHMSA has not done so.

There's an even larger problem looming behind PHMSA's gauzy reading of section 192.619(a)(3). By bringing this enforcement action, PHMSA seeks to penalize FGT for not having "operating pressure records" from 1965 to 1970—a time before there were even any regulations. PHMSA is trying to apply a recordkeeping standard promulgated in 1970 to operating pressures from 1965 to 1970.

MAOP was established on the Sanford Lateral decades ago: in 1959 and 1975, followed by a change between 1975 and 1989.

### 1.    1959

Immediately after the Sanford Lateral's construction in 1959, a hydrostatic pressure test ("hydrotest") was successfully run to a maximum pressure of 1075

psig.  A.1175-77, 1181-522; *see* A.2227-28, 2306-07.  Although the 1959 hydrotest was pre-regulation, under then-prevailing industry standards that required discounting that figure to account for design limitations, the hydrotest-based MAOP was 977 psig.  *See generally* A.2043 & nn.39-42 (explaining in detail the calculations).  The 977 psig MAOP figure is reflected in FGT records.  A.1585-86; *see* A.2309-10.

### 2.    1975

The original gas pipeline safety regulations promulgated in 1970 required operators to make an initial determination of "class location"—a measure of population density around a pipeline segment—and to confirm that the established MAOPs were appropriate for the pipeline's class location.  That had to be done by a specified deadline, which was eventually extended to January 1, 1974.  49 C.F.R. § 192.607.[11]

In 1973, a pressure regulator was installed on the Sanford Lateral to limit the pressure to 866 psig.  A.1587-88.  Then in 1974, a hydrotest was run on a portion of the Sanford Lateral in an area of Class 2 and Class 3 locations.  A.1589-90.  *See generally* A.2044-45 (detailing the results and the calculations).  As a result of that test, the Sanford Lateral was equipped with a pressure regulator to limit pressure to

---

[11] *See* Extension of Time for Confirmation or Revision of MAOP, 36 Fed. Reg. 18,194, 18,195 (Sept. 10, 1971).  After the compliance dates had passed, in 1996 section 192.607 was removed and appeared as "reserved" until it was later re-used for a different regulation.

the maximum stress level allowed in the Class 3 areas to 866 psig.  49 C.F.R. § 195.2.

That number became the limiting factor over the entire length of the Sanford Lateral.

And it was documented that the MAOP was established at that time at 866 psig.

A.1591-92; *see* A.2313-14 (explaining A.1591-92).  Taken together, then, the 1959 and

1974 hydrotests support an MAOP of 866 psig.

### 3.  1975–1989

Between 1975 and 1989, the Sanford Lateral MAOP was changed to 713 psig.

That figure is documented on the "Enron Gold Sheet."  A.42-43 (RE.2:1); *see*

A.2255-56, 2259.  The Gold Sheet reflects that MAOP of 713 was established under

section 192.619(c)'s "grandfather" clause, allowing a pipeline to be operated at the

"highest actual operating pressure to which the segment was subjected during the 5

years preceding" July 1, 1970.  49 C.F.R. § 192.619(c).  The information recorded on

the Gold Sheet is based on a review of records in 1989 by the Sanford Lateral's then-

owner Enron, A.2319, making the Gold Sheet an "operating pressure record."

### D.  FGT established MAOP under section 192.619(a)(3).

In the alternative to historical establishment of MAOP for the Sanford Lateral,

FGT also established MAOP under section 192.619(a).  Recall that under section

192.619's subsection (a), MAOP is limited to the lowest of four designated pressure

values.  Neither the notice of probable violation nor the final order for Item 3 take

issue with FGT's establishment of MAOP under subsections (a)(1), (a)(2), or (a)(4).

The evidence showed that the MAOP figures under those three subsections are:

1.  Design basis of the pipe and its components, section 192.619(a)(1)—721 psig,[12]

2.  Pressure-test basis, section 192.619(a)(2)—945 psig,[13] and

4.  The maximum safe pressure determined by the operator considering the pipeline segment's material properties and its history, including known corrosion and operating pressure, section 192.619(a)(4)—not less than 713 psig.[14]

*See* 49 C.F.R. § 192.619(a).

Instead, PHMSA fixated exclusively on subsection (a)(3). *See* A.2926-27. In relevant part, subsection (a)(3) provides:

(a) No person may operate a segment of steel . . . pipeline at a pressure that exceeds [MAOP] determined under paragraph (c), (d), or (e) of this section, or the lowest of the following:

. . . .

(3) The highest actual operating pressure to which the segment was subjected during the 5 years preceding the applicable date in the second column [July 1, 1970]. . . .

---

[12] *See* A.2324-25; A.1169-70. *See generally* A.2049 (explaining that the pipe's lowest design pressure is 721 psig and that all components had design pressures higher than that).

[13] *See generally* A.2049-50 (explaining the hydrotest-basis calculations resulting in 945 psig, including how the Class location factor of 1.4 yields a 758 for the 1959 hydrotest and a 945 for the 1974 hydrotest).

[14] *See* A.2335-36 (testifying about the segment's material properties and its history, including known corrosion and operating pressure); A.1173-74. *See generally* A.2050-51 (explaining the consideration of the factors under this subsection).

49 C.F.R. § 192.619(a); *see also* Add.C.

The Gold Sheet record verifies that the highest actual operating pressure to which the Sanford Lateral was subjected to over that five-year time period was not less than 713 psig. A.42-43 (RE.2:1); *see* A.2255-56, 2259 (walking through the information and figures on the Gold Sheet); *see also supra* Section I.D.3. The 713 psig value—the lowest design pressure along the Sanford Lateral, including all downstream extensions, A.1591-92—is itself derived from the lowest of section 192.619(a)'s four designated series of pressures. Thus the highest actual operating pressure in the five years preceding July 1, 1970 couldn't have been less than 713 psig.

## E. FGT also established MAOP under the alternate method provided for in subsection (c).

In the further alternative, FGT established MAOP on the Sanford Lateral under section 192.619(c)—the "grandfather" clause. In 1970, it provided:

> Notwithstanding the other requirements of this section, an operator may operate a segment of pipeline found to be in satisfactory condition, considering its operating and maintenance history, at the highest actual operating pressure to which the segment was subjected during the 5 years preceding July 1, 1970, subject to the requirements of § 192.611.

49 C.F.R. § 192.619(c). On the date of the incident, section 192.619(c) read similarly; the notwithstanding clause was replaced by a sentence to the same effect, and the July 1, 1970 date was replaced by a reference to the chart accompanying section 192.619(a)(3), which, here, results in the same date.

27

The Gold Sheet establishes that Enron evaluated records to determine that the Sanford Lateral's MAOP was 713 psig. A.42-43; *see* A.2255-56, 2259. Based on his 42 years of experience, FGT's Director of Pipeline Safety described the types of records that underly the information memorialized on the Gold Sheet. A.2304-08, 2319. And industry expert Mark Hereth concurred. In his professional opinion informed by lengthy and first-hand knowledge of the regulations at hand and the rulemaking process, he confirmed that the Gold Sheet is a "record of the highest actual operating pressure that was used by Enron at that point in time." A.2349-51. PHMSA, who bore the burden of proof, put on no evidence to the contrary.

Item 1 should be withdrawn.

## II.    The Item 3 violation found by PHMSA represents an unlawful exercise of agency power.

### A.    In finding a violation for FGT's 2019 tool run, PHMSA misreads the regulations.

Item 3 concerns an internal-inspection tool FGT ran on September 19, 2019 as part of FGT's integrity-management program. A.2933-37; *see* A.1172. In Item 3, PHMSA found that FGT violated 49 C.F.R. § 192.937 because FGT failed to follow ASME/ANSI B31.8S section 6.2 ("B31.8S") in selecting "the appropriate internal inspection tools" for that 2019 tool run. A.2933; *see* Add.G (B31.8S—2004). The gravamen of Item 3 is PHMSA's complaint that FGT should have selected a tool in

2019 able to detect selective-seam-weld corrosion—an axial-seam defect—even though that was concededly not the cause of the Sanford Lateral rupture.[15]

PHMSA's conclusion on Item 3 misreads its own unambiguous regulations. As we explain below, PHMSA's reading skips past the threat-identification process the regulations prescribe at the threshold. Adhering to the regulation's threat-identification process, FGT properly determined that the Sanford Lateral pipe was not susceptible to a threat that required compliance with B31.8S section 6.2 in the first instance. Thus the violation found under Item 3 cannot stand.

### 1.    Technical background

We start with some technical background to give context for the Item 3 violation PHMSA found concerning FGT's tool selection for its tool run on September 19, 2019 ("2019 tool run"). *See* A.1172.

The Sanford Lateral, constructed in 1959, is made of pre-1970 low-frequency electric resistance welded ("LF-ERW") steel pipe. LF-ERW pipe is made by heating the edges of a steel strip with a low frequency alternating current while forcing the edges together under pressure forming a longitudinal (axial) seam. As this Court has observed, pipelines constructed of LF-ERW pipe are "known to have

---

[15] The rupture was caused by stress-corrosion cracking, not by an axial defect in the long seam. A.2932-33 & nn.29, 31. PHMSA's preferred tool (MFL-C), thus, would've made no difference.

29

a higher risk of seam failure than other types of pipe due to manufacturing defects." *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 568-69 (5th Cir. 2017). So assessing the integrity of LF-ERW pipes, among many other things, are addressed by the integrity-management-program regulations.

Under their integrity-management programs, operators like FGT conduct periodic, routine assessments of their pipes. 49 C.F.R. § 192.917(d). One of the assessment methods operators use is an "internal" or "in-line" inspection—a method that "inspect[s] the pipeline from the inside." 49 C.F.R. § 195.2.

As to Item 3, the parties clash over which type of in-line inspection tool FGT should have used for a 2019 tool run. In PHMSA's view, B31.8S section 6.2—referenced in section 49 C.F.R. § 192.937(c)(1)—required FGT to use an in-line inspection tool known as the "MFL-C" tool, so named because it uses circumferentially oriented magnetic-flux leakage designed to detect axially aligned metal-loss defects. A.283 (B31.8S § 6.2.1(e)); A.2936. FGT's 2019 tool run—and its 2014 tool run—used the "MFL-A" tool, which uses axially oriented magnetic-flux leakage to detect circumferentially aligned metal-loss defects. A.2474, 2498-99. Because B31.8S section 6.2.1(a) says an MFL-A tool is "not reliable for detection or sizing of axially aligned metal-loss defects," A.283 (B31.8S § 6.2.1(a)), PHMSA concluded that FGT's tool selection violated 49 C.F.R. § 192.937(c)(1). A.2933.

30

## 2. PHMSA's section 192.937(c)(1) tool-selection violation incorrectly bypasses the threat-identification determination that must be made as the threshold.

The analysis starts with the "regulation's plain language." *Anthony v. United States*, 520 F.3d 374, 380 (5th Cir. 2008). If the regulation's text is unambiguous, the court doesn't look beyond the regulation's plain wording to determine its meaning. *Copeland v. C.I.R.*, 290 F.3d 326, 332-33 (5th Cir. 2002).

Section 192.937(c)(1) provides:

**§ 192.937 What is a continual process of evaluation and assessment to maintain a pipeline's integrity?**

. . . .

(c) **Assessment methods**. In conducting the integrity reassessment, an operator must assess the integrity of the line pipe in the covered segment by any of the following methods *as appropriate for the threats to which the covered segment is susceptible (see § 192.917)*, or by confirmatory direct assessment under the conditions specified in § 192.931.

(1) Internal inspection tool or tools capable of detecting corrosion, and any other *threats to which the covered segment is susceptible*. An operator must follow ASME/ANSI B31.8S (ibr, *see* § 192.7), section 6.2 in selecting the appropriate internal inspection tools for the covered segment.

49 C.F.R. § 192.937(c)(1) (emphasis added) (amended Oct. 1, 2019, eff. July 1, 2020).[16]

---

[16] Sections 192.937(c) and 192.917(e)(4) were amended "after FGT conducted its 2014 and 2019 tool runs." A.2933 n.32. Unless otherwise indicated, all citations to Part 192 in Section II of the brief are to the versions of the regulations in effect as of FGT's 2019 tool run. A.1172.

In finding FGT violated section 192.937(c)(1), PHMSA focused on the language in subsection (c)(1) about following ASME/ANSI B31.8S, section 6.2. In PHMSA's view, if the regulations' threat-identification process required an internal-inspection-assessment method, then B31.8S section 6.2 would've required FGT to select a different internal-inspection tool than the one used for its 2019 tool run. But in advancing that view, PHMSA gets the sequencing backwards.

PHMSA skates right past section 192.917's provisions for making the susceptibility determination—the threshold question that must be answered first. Section 192.937(c) itself directs pipeline operators to section 192.917 for the method of determining the "threats to which the covered segment is susceptible." 49 C.F.R. § 192.937(c). On that front, section 192.917 itself is captioned, "**How does an operator identify potential threats to pipeline integrity and use the threat identification in its integrity program?**" 49 C.F.R. § 192.917. True to its caption and its cross-reference in section 192.937, section 192.917 provides a process for identifying threats to which a covered segment is *susceptible*.

Section 192.917 starts with a provision called "Threat identification." *Id.* § 192.917(a). It requires operators to identify and evaluate all potential threats to each covered pipeline segment—mandating that operators "consider" threats listed in ASME/ANSI B31.8S section 2, which are grouped under four threat categories:

time-dependent, static or resident threats, time-independent threats, and human error.  49 C.F.R. § 192.917(a)(1)–(4).

Building off these threat categories operators must "consider," subsection (e) singles out "particular threats" for special treatment, expressly directing operators how to use threat identification for these particular threats in their integrity-management programs.  Subsection (e)(4), addressing EWR pipe including LF-ERW pipe, is relevant here.  Under it, LF-ERW pipe is considered susceptible *if* such pipe in the preceding five years "has experienced seam failure":

> (4) **ERW pipe.**  If a covered pipeline segment contains low frequency electric resistance welded pipe (ERW), . . . and any covered or noncovered segment in the pipeline system with such pipe has experienced *seam failure* . . . during the preceding five years, an operator must select an assessment technology or technologies with a proven application capable of assessing seam integrity and seam corrosion anomalies. . . .

49 C.F.R. § 192.917(e)(4) (emphasis added) (amended Oct. 1, 2019, eff. July 1, 2020) (Add.C).

In keeping with that structure, if one of section 192.917(e)(4)'s conditions were satisfied, then an operator "must select an assessment technology or technologies with a proven application capable of assessing seam integrity and seam corrosion anomalies," *id.*, directing the operator back to the "Assessment methods"

in section 192.937(c)(1).[17] But if none of the listed conditions are satisfied, section 192.937(c) doesn't come into play.

In explaining the basis for its decision on Item 3, PHMSA disagrees that section 192.937(c) (which expressly references section 192.917) and section 192.917(e)(4) should be read together. A.2934 n.34. In PHMSA's telling, only subsection (a) of section 192.917 "outlines the *process* operators must follow to determine which threats they are susceptible to; subsection (e)(4) of 192.917 merely sets forth specific *actions* operators must take to address known issues with ERW pipe." A.2934 n.34. That cannot be right.

Taken seriously, PHMSA's reading would render section 192.917(e)(4)'s susceptibility criteria for LF-ERW pipe a nullity. In truth, PHMSA's reading reflects the view that all LF-ERW pipe is *per se* deemed susceptible to longitudinal-seam failures. Thus, in PHMSA's view, the presence of all LF-ERW pipe—whether there's been a "seam failure" "during the preceding 5 years" or not, *id.*—*automatically* requires a tool selection able to detect seam-integrity and seam-corrosion anomalies. But that contention expressly conflicts with section

---

[17] *Accord* 49 C.F.R. § 192.921(a) (utilizing the same threshold-determination structure: "An operator must assess the integrity of the line pipe in each covered segment by applying one or more of the following methods *depending on the threats to which the covered segment is susceptible*. An operator must select the method or methods best suited to address *the threats identified to the covered segment (See § 192.917).*" (emphasis added)).

192.917(e)(4), which requires a history of "seam failures" in the specified window of time. That agency position even conflicts with section 192.937(c) itself, which expressly directs operators to section 192.917 to determine threat susceptibility. Part 192 contains no blanket rule for LF-ERW pipe.

Nor should this Court accept PHMSA's alternate reading of section 192.917(e)(4)—that it doesn't prescribe an "exclusive list of criteria for use in determining appropriate assessment tools" for LF-ERW pipe. A.2934 n.34. To begin, there's no language in subsection (e)(4)'s text (like "including") supporting this asserted non-exclusivity. Anyway, PHMSA's proffered alternate reading gives up the game. It implies that—even with LF-ERW pipe—operators have wide latitude in how they'll weigh various risk factors listed in B31.8S in identifying threats to which a segment is susceptible and in how to prioritize those segments for assessment. PHMSA thus acknowledges that Part 192's pipeline-integrity regulations lack any presumption about LF-ERW pipe's susceptibility.

The bottom line is that section 192.917's threat-identification process wouldn't have required FGT to "select an assessment technology or technologies with a proven application capable of assessing seam integrity and seam corrosion anomalies." 49 C.F.R. § 192.917(e)(4). Or, to use section 192.937's language, section 192.917's threat-identification process would not have resulted in identifying

axially aligned metal-loss defects as "threats to which the [Sanford Lateral] is susceptible (see 49 C.F.R. § 192.917)." 49 C.F.R. § 192.937(c)(1). Either way, section 192.937(c)(1)'s tool-selection provision was never triggered. Thus Item 3, premised on PHMSA's mistaken contention otherwise, should be vacated.

**B.    PHMSA's section 192.937(c) analysis is blocked by precedent.**

PHMSA resists the conclusion that section 192.937(c) is dependent on first identifying threats to which a segment is susceptible under section 192.917. A.2933-37. But its analysis runs up against this Court's decision in *ExxonMobil*.

**1.    Section 192.937(c)'s "threats to which the covered segment is susceptible" language creates an if-and-only-if condition.**

This Court has been down this road before. Take *ExxonMobil*. There, this Court examined pipeline-integrity regulations under 49 C.F.R. § 195.452. *See ExxonMobil*, 867 F.3d at 568. While Part 195 governs hazardous liquids (like oil and petroleum products), and Part 192 governs natural and other gas, both were promulgated under the Pipeline Safety Act, 49 U.S.C. § 60102(a)(2), which directs the Transportation Secretary to "prescribe minimum safety standards for pipeline transportation." *ExxonMobil*, 857 F.3d at 568.

Like the Part 192 regulations here, the Part 195 regulations in *ExxonMobil* "require each pipeline operator to create . . . an integrity management program

('IMP') for all pipelines that could affect a high consequence area."[18]  867 F.3d at 568; *accord* 49 C.F.R. pt. 192 subpt. O.  Part 195's pipeline-integrity regulations also list the "methods" by which the operator is to conduct integrity reassessments. *ExxonMobil*, 867 F.3d at 568 (citing 49 C.F.R. § 195.452(j)(5)).

The parallels between Part 195 provisions *ExxonMobil* considered and Part 192 provisions here are striking.  To start, sections 195.452(j) and 192.937 are both captioned identically:  "**What is a continual process of evaluation and assessment to maintain a pipeline's integrity?**"  In turn, both have provisions identically captioned, "*Assessment methods*" that call for selection of a method that's "capable of" or "appropriate for" assessing the threats to which the pipe is "susceptible."

As to Part 195, the assessment-method provision specifically calls out LF-ERW pipe, providing that "[t]he methods an operator selects to assess low frequency electric resistance welded pipe or lap welded pipe *susceptible to* longitudinal seam failure must be capable of assessing seam integrity and of detecting corrosion and deformation anomalies."  49 C.F.R. § 195.452(c)(1) (emphasis added).  Even then, *ExxonMobil* reads this "susceptible to" language as creating an if-and-only-if condition:  "According to the regulations, if—and only if—the LF-

---

[18] For Part 195, "[h]igh consequence areas include populated areas, areas that are unusually sensitive to environmental damage, or commercially navigable waterways." *ExxonMobil*, 867 F.3d at 568 (citing 49 C.F.R. § 195.452); *accord* 49 C.F.R. § 192.903 (focusing on distance from buildings intended for human occupancy).

ERW pipeline segment is shown to be 'susceptible to longitudinal seam failure,' then the methods an operator selects to assess that segment "must be capable of assessing seam integrity and of detecting corrosion and deformation anomalies." *ExxonMobil*, 867 F.3d at 568 (citing 49 C.F.R. § 195.452(j)(5)). So too here under Part 192.

This side-by-side comparison shows that the two provisions are of the same ilk. Given that equivalence, nothing counsels construing section 192.937(c) as driving a different conclusion.

| 49 C.F.R. § 195.452(j)(5) | 49 C.F.R. § 192.937(c) |
|---|---|
| *Assessment methods*. An operator must assess the integrity of the line pipe by any of the following methods. The methods an operator selects to assess [LF-ERW] pipe or lap welded pipe *susceptible to* longitudinal seam failure must be **capable of** assessing seam integrity and of detecting corrosion and deformation anomalies. | *Assessment methods*. In conducting the integrity reassessment, an operator must assess the integrity of the line pipe in the covered segment by any of the following *methods as appropriate for the threats to which the covered segment is susceptible (see § 192.917)*, or by confirmatory direct assessment under the conditions specified in § 192.931. |
| (i) In-Line Inspection tool or tools **capable of** detecting corrosion and deformation anomalies, including dents, gouges, and grooves. For pipeline segments that are susceptible to cracks (pipe body and weld seams), an operator must use an in-line inspection tool or tools capable of detecting crack anomalies. . . . | (1) Internal inspection tool or tools **capable of** detecting corrosion, and any other *threats to which the covered segment is susceptible*. An operator must follow ASME/ANSI B31.8S (ibr, see § 192.7), section 6.2 in selecting the appropriate internal inspection tools for the covered segment. |

*Compare* Add.I (emphasis added) *with* Add.E (emphasis added).

If anything, section 192.937(c) presents the stronger case for the conclusion *ExxonMobil* reaches. By providing that an operator "must assess the integrity" "by any of the following methods as appropriate for the threats to which the covered segment is susceptible (see § 192.917)," section 192.937(c) more clearly spells out the if-and-only-if construction this Court concluded is created by section 195.452(j)(5)'s "susceptible to" language. *ExxonMobil*, 867 F.3d at 568. In short, given this Court's holding in *ExxonMobil* construing section 195.452(j)(5), PHMSA was not free to read Part 192's counterpart differently.

> **2.    Nothing in Part 192 compels the conclusion that LF-ERW pipe is deemed *per se* susceptible to selective-seam-weld corrosion.**

The final order makes one thing clear: PHMSA deems all LF-ERW pipe *per se* susceptible to selective-seam-weld corrosion. But that's not what Part 192 says. If all LF-ERW pipe is deemed susceptible to that threat, then the agency could modify sections 192.937(c) and 192.917(e)(4) to so provide. But PHMSA has not done so. More to the point, no such regulation was in place at the time of the 2019 tool run.

This is no academic concern. Take once more, then, the *ExxonMobil* decision. There, PHMSA took the position under Part 195, as it does here under Part 192, that all LF-ERW pipe is automatically deemed susceptible to longitudinal-seam failures.

*ExxonMobil*, 867 F.3d at 575 n.5. PHMSA's reasoning turned on a defunct Part 195 regulation incorporating a "rebuttable presumption" that "'[a]ll pre-1970 LF-ERW pipe is deemed susceptible to longitudinal seam failures unless an engineering analysis shows otherwise.'" *Id.* (quoting 49 C.F.R. § 195.303(d) (*see* Add.H)). But because section 195.303(d) became "obsolete" after December 1998, when PHMSA later promulgated the pipeline-integrity regulations at issue in *ExxonMobil*—but failed to "create a similar rebuttable presumption regarding pre-1970 LF-ERW pipe"—section 195.303(d)'s then-obsolete rebuttable presumption didn't provide ExxonMobil "with notice that it was compelled to deem its LF-ERW pipe as susceptible to longitudinal seam failure." *Id.*

Here too, Part 192 lacks any presumption about LF-ERW pipe. Far from it, section 192.937(c) directs operators to section 192.917's process for figuring out the threats to which a pipeline is susceptible. In turn, section 192.917(e)(4) specifically addresses LF-ERW pipe. But none of its listed conditions were satisfied. *Accord* A.728-31. The only condition potentially relevant here was "seam failure," but FGT didn't experience "seam failure" in the specified five-year window on the Sanford Lateral—or anywhere else on its pipeline system. We turn to that question next.

**C. PHMSA's finding that section 192.917(e)(4)'s language was satisfied isn't supported by evidence this Court can credit.**

To wire around its textually incoherent reading of the way sections 192.937 and 192.917 work in conjunction with each other, PHMSA finds that section 192.917(e)(4)'s language was nevertheless satisfied. A.2933-37. For support, the final order cites a purported "history of seam integrity *failures* on [FGT]'s system including an actionable axial seam defect identified in 2014 on the Sanford Lateral." A.2934 (emphasis added). That conclusion suffers from multiple flaws. We address each in turn.

*First*, the only prior history the final order cites within the five years preceding the 2019 tool run concerns anomalies—but not "seam *failures*." 49 C.F.R. § 192.917(e)(4) (emphasis added). A "seam failure"—which is the only thing that satisfies section 192.917(e)(4)—is a loss of containment: product unintentionally escaping from the pipe, such as a leak or a rupture.[19] *See, e.g.*, *ExxonMobil*, 867 F.3d at 560-70 (giving an example of "seam failure"—"the release of several thousand barrels of crude oil from a pipeline [ExxonMobil] owned and operated"). An anomaly may cause a seam failure, but it isn't itself a seam failure.

---

[19] *See, e.g.*, Pipeline Safety: Safety of Gas Transmission and Gathering Pipelines, 81 Fed. Reg. 20,722, 20,728-29 (proposed Apr. 8, 2016), *available at* A.848, 855-56

Consider the final order's cite to FGT's 2014 tool run. The final order says FGT identified an "anomaly." A.2935 & n.39. But that's not enough. And when the final order says that the anomaly "was found to be" or "is classified as" "selective seam weld corrosion, a type of axial defect," neither is that enough.[20] That's because neither a "seam anomaly" nor an "axial defect" is a "seam failure." *After* the 2019 tool run, PHMSA amended section 192.917(e)(4) to expand the phrase "seam failure" to include "seam cracking and selective seam weld corrosion," but that amended version didn't take effect until July 1, 2020—some nine months after the 2019 tool run.[21] *See* Add.D.

*Second,* even then, no evidence supports that the anomaly noted in 2014 was actually "found" to be selective-seam-weld corrosion. A.2935-36 & nn.39-42. Indeed, the referenced internal-inspection report doesn't say that it was. Instead, it say only the anomaly found was "classified" as selective-seam-weld corrosion and was remediated. A.2935.

---

[20] Though the final order doesn't mention it, FGT also demonstrated that a finding of susceptibility wasn't warranted under section 192.917(e)(3) governing manufacturing and construction defects (including seam defects), which under certain conditions can be considered stable. A.729-30 (RE.7:8-9).

[21] *See* PHMSA Order Approving Gas Transmission Pipeline Safety Rule Changes: MAOP Reconfirmation, Expansion of Assessment Requirements, and Other Related Amendments, 84 Fed. Reg. 52,247, 52,237, 52,253 (Oct. 19. 2019) (codified at, *inter alia*, 49 C.F.R. § 192.917(e)(4)), *available at* A.986, 1044, 1060 [hereinafter cited in Section II of this Brief as "Expansion of Assessment Requirements"].

Anyway, nothing suggests that a portion of the pipe was removed and sent to a laboratory for metallurgical testing. Quite the opposite: we know that wasn't done here; as the final order observes, the anomaly was remediated in 2015 by a Class B "sleeve installation"—a technique that encapsulates (not removes and replaces) the part of the pipeline where an anomaly is found.[22] A.2936; *see* A.75, 94, 1936, 1955; *see* 49 C.F.R. § 192.717(a)–(b).

And, of note, the final order simultaneously says that the in-line tool FGT ran in 2014 wasn't able to detect selective-seam-weld corrosion. A.2935. But PHMSA can't have it both ways. Either the 2014 tool was able to detect selective-seam-weld corrosion, or the anomaly found in 2014 was not actually determined to be selective-seam-weld corrosion.[23] Either conclusion undercuts Item 3, leaving PHMSA's contrary finding lacking in support.

---

[22] Although the final order characterizes the anomaly found as an "actionable" defect, A.2934, "actionable" in integrity-management parlance probably means that an anomaly triggers repair criteria. 49 C.F.R. § 192.933(d). But the final order cites no regulation or evidence that any reportable incident occurred in connection with the 2014 tool run addressed by FGT's 2015 sleeve installation. A.730.

[23] Most modern 2022 in-line inspection tools couldn't identify selective-seam-weld corrosion, A.2499-501, so for the 2014 or 2019 tools to identify such features would've been impossible—a point PHMSA conceded at the hearing. *See* A.2503.

*Third*, consider next the final order's references to the May 4, 2009 and December 26, 2002 ruptures.  Neither incident occurred within five years preceding the 2019 tool run.  So neither falls within section 192.917(e)(4).

*Fourth*, neither of those two incidents—nor the extra-record Corrective Action Orders (CAOs) the final order cites for its unsupported assertions about them—were part of the agency "case file."  49 C.F.R. §§ 190.209, 190.211(g).  Nor did PHMSA mention them during the hearing.  Some, but not all, appeared for the first time in the region recommendation that issued after the record here closed.  A.2558, A.2803-18.  Either way, though, relying on extra-record materials not only violates section 190.211(g), but it also deprived FGT of the opportunity to explore the relevance—if any—of those other incidents, including whether FGT considered them.  A.2558, A.2803-18; *see infra* Section III.A.

*Fifth*, consider also that these two time-barred incidents—neither of which involved regulatory violations—aren't on the Sanford Lateral, but many miles away.[24]  And although the final order says these two incidents stemmed from pipe that's the same vintage and manufacture as the Sanford Lateral, it downplays that the pipes were different diameters than the Sanford Lateral.  A.2936.  On top of those

---

[24] One occurred in Melbourne, Florida, and the other in Hobe, Florida—more than 75 miles and 150 miles, respectively, from Sanford, Florida.  A.2936.

differences, there's no evidence about whether those other pipes have different coatings or different grade steel. Nor is there any evidence about the environmental conditions or other external stresses to which they have been subjected. Yet exactly such differences led PHMSA to conclude on Item 2 that the OPS failed to meet its burden of proof about whether the Sanford Lateral should have been added to FGT's stress-corrosion-cracking program. A.2933.

*And sixth*, the final order posits that the entire pipeline system's history, including the 2014-tool-run anomalies, were data points that should have "informed FGT when it made its decision not to change ILI tools" for its 2019 tool run. A.2936. But that's just a backdoor way of listing things that FGT should "consider" when selecting an in-line inspection tool. And that position runs headlong into *ExxonMobil*. *See* 867 F.3d at 574 (holding that a pipeline-integrity regulation that instruct operators to "consider" all risk factors that reflect risk conditions on a pipeline segment is a "process-based requirement," not one that mandates a particular outcome). In sum, the agency's conclusion that FGT should have considered these time-barred incidents is unsupportable.

⁂

Given that PHMSA's tool-selection conclusion hinges on its misapprehension of sections 192.937(c) and 192.917(e)(4), on evidence this Court cannot credit, and

giving no credence to this Court's decision in *ExxonMobil*—Item 3 should be vacated. No "rational connection" between the facts and the decision may be found for Item 3. *Pension Benefit*, 374 F.3d at 366.

## D. The challenged violations depend on regulatory interpretations that offend due process and fair notice.

Perhaps most dispiriting is what lies behind PHMSA's approach for tool selection. There are two possible explanations: (1) PHMSA adopted new, enforcement-related interpretations of integrity-management regulations that denied FGT fair notice, or (2) PHMSA has adopted or applied a post-hoc strict-liability approach—one that Congress didn't authorize—in enforcement actions following reportable incidents. Both of those explanations reflect unlawful agency action.

The fair-notice standard requires clarity that's missing here. Again, due process requires agencies to "give fair notice of conduct that is forbidden or required." *Fox Television*, 567 U.S. at 253; *see supra* Section I.B. This requirement of clarity and ascertainable certainty in regulation is "essential to the protections provided by the Due Process Clause of the Fifth Amendment." *Id.* Thus, even if this Court were to determine that the regulations governing seam failure susceptibility are ambiguous, no *Auer* deference to PHMSA's interpretation would be warranted.

These concerns are implicated here. FGT lacked sufficient notice of what's proscribed. The lengthy procedural history shows that FGT didn't have fair notice of what was forbidden. In particular, PHMSA's enforcement of provisions not added to the regulations until after FGT's 2019 tool run deprives FGT of fair notice.

Under the regulations in force when FGT performed its 2019 tool run, a key consideration was whether there had been a "seam failure" within the preceding five years. There hadn't been. But in the final order, PHMSA applies the new enhancement promulgated in the October 1, 2019 amendments that took effect July 1, 2020 to determine that FGT's previously completed September 19, 2019 tool run somehow violated a version of section 192.937(c)(1) not yet adopted.

This regulatory history, however, illuminates that PHMSA policy in place at the time of the 2019 tool run gave no notice to FGT that PHMSA effectively had a blanket rule that LF-ERW pipe is automatically deemed susceptible. PHMSA's lack of notice to FGT—that its interpretation had changed so that the failure to select a tool able to detect an axially aligned metal-loss defect automatically violates section 192.937(c)(1), regardless of whether section 192.917(e)(4)'s conditions (as interpreted and enforced by PHMSA) were present—"fail[ed] to provide a person of ordinary intelligence fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 304 (2008). For this added reason, Item 3 should be vacated.

III.    **Independently, the final order offends due process in two more ways.**

In addition to the fair-notice problems that plague PHMSA's finding of a violation on Item 3, *see supra* II.D, PHMSA's final order violates FGT's due-process rights in two more ways. If this Court affirms either violation finding, these two due-process challenges, individually or collectively, require a remand.

A.    **PHMSA considered materials outside the agency record.**

As mentioned earlier, *supra* II.C, in an effort to plug holes in the agency's case, the final order's analysis of Item 3 resorts to relying on several documents that aren't part of the agency "case file." 49 C.F.R. §§ 190.209, 190.211(g). The extra-record documents include some CAOs issued in connection with two other incidents on FGT's pipelines.[25] A.2935-36 & nn.37, 40, 44-45. What evidence or materials are made part of the case file matters. For instance, a CAO is no evidence of what caused either incident. That's because CAOs make no findings; they present only "preliminary findings."[26]

None of the extra-record documents were even mentioned during the hearing. Some made their first appearance in the region recommendation, *e.g.*, A.2803-18,

---

[25] That same passage in the final order also references at the tail end of a footnote an "apparent[]" rupture in 2014 in Port St. John, Florida. A.2936 n.45. But on this point, the final order cites no evidence—part of the case file or not.

[26] *See* https://primis.phmsa.dot.gov/enforcement-data/actions/cases-initiated (explaining the range of civil-administrative-enforcement-case types).

2558, while others debuted in the final order. Both junctures were after the record closed. A. 2558. So PHMSA's consideration of new matters at either juncture was too late and wholly improper.

That's true both as a matter of congressional command, PHMSA's own regulations, and as a matter of due process. *See* U.S. Const. amend. V; 49 U.S.C. § 60117(b)(1); 49 C.F.R. §§ 190.209, 190.211(g). Doing so for the first time in either the final order or the region recommendation (both of which, again, were after the record closed, A.2558, A.2803) deprived FGT of the opportunity to explore during the hearing the relevance—if any—of those other incidents, including whether FGT considered them and whether they change the susceptibility determination. A.2558, A.2803-18; *see infra* Section IV. None of these are merely idle curiosities. Again, because no actual findings are made in CAOs, a CAO is no evidence of what caused an incident.

So too, the case file contains no evidence that LF-ERW pipe is at higher risk of longitudinal-seam failure. Again after the record closed, PHMSA's Southwest Region tried to spackle over this gap by sliding evidence—not previously provided— into the record via the region recommendation. A.2816 n.60. The final order cites and relies on that very document. A.2934 & n.36 (citing A.2816 n.60).

Here's the rub: the agency bore the burden of proof. But without these extra-record documents, PHMSA remains without evidence that the LF-ERW pipe on FGT's Sanford Lateral is subject to a higher risk of selective-seam-weld corrosion or any other threat. Whether as a matter of due process or statutory and regulatory commands, FGT's due-process rights to a full and fair adjudication demand more.

**B.** **PHMSA's refusal to produce the civil-penalty worksheet in Excel also deprived FGT of due process.**

In preparing its defense of this civil-enforcement proceeding and after reviewing the limited content of the agency case file, FGT issued PHMSA a request for documents, which included the following request:

> All documents within the scope of 49 U.S.C. § 60117(b)(1), (b)(1)(C), not otherwise requested above, which reads: "In implementing enforcement procedures under this chapter and part 190 of title 49, Code of Federal Regulations (or successor regulations), the Secretary shall * * * require that the case file in an enforcement proceeding include all agency records pertinent to the matters of fact and law asserted."

A.372-74. Among the documents FGT requested, but didn't receive, is the native version of PHMSA's Excel spreadsheet its Enforcement Division uses to calculate proposed civil penalties. At the hearing, FGT pressed the issue again about needing the spreadsheet, but was once again denied. A.2525-29. In its telling, "PHMSA fulfills its due process to [FGT] by providing the case file in full, which includes the

PDF civil penalty worksheet you've requested." A.2542. But the PDF version isn't good enough.

To begin, FGT has a right to receive "all agency records pertinent to the matters of fact and law asserted." 49 U.S.C. § 60117(b)(1); *see also* 5 U.S.C. § 706(2)(A), (D) (agency acts arbitrarily and capriciously when it acts "without observance of procedure required by law"). As a PHMSA Enforcement Division witness conceded, the civil-penalty worksheet "is relevant to the case that we're discussing here today." A.2528-29 (RE.6:5).

That witness also testified to calculations and algorithms within the Excel version of the civil-penalty worksheet that operate "in the background." A.2539. His testimony confirms that no regulated operator is able to discern—either by looking at the worksheet in PDF or PHMSA's "Civil Penalty Summary"[27]—exactly how those calculations and algorithms function to establish the proposed civil penalties. A.2524-33 (RE.6); *see* A.2524 ("But the background calculations or numerology with the Civil Penalty Worksheet, . . . you won't find that accessible."). Because FGT was denied access to that document when it mattered,[28] it had no way to verify the veracity of PHMSA's witnesses or to uncover potential bias.

---

[27] *See* https://bit.ly/4aAhgF6, *cited in* A.2940 n.54.

[28] After steadfastly refusing to provide FGT with the native Excel version to give FGT access to the embedded algorithms, A.2524-31, 2541-42 (RE.6:9-10), the amended certified index PHMSA

In its final order, though, PHMSA rejects FGT's due-process complaint about the native Excel version of the civil-penalty worksheet. A.2940-41. It reasons that by giving FGT access to the flattened PDF version of the spreadsheet, along with a four-page civil penalty summary document that self-describes as giving only a "general overview," https://bit.ly/4aAhgF6, PHMSA says FGT has all the transparency it needs—or at least all that PHMSA is willing to supply.

In crafting the final order, PHMSA's Associate Administrator was apparently persuaded by the region recommendation's view that "FGT's request is akin to requesting the Microsoft Word versions of the Notice and Pipeline Safety Violation Report. In both scenarios, the PDF versions contain all relevant information upon which PHMSA bases its allegations." A.2818 n.66. Not so.

---

filed in lieu of a record under FED. R. APP. P. 17(b)(1)(B) lists the native Excel version as Doc. No. 2. So that FGT could comply with 5TH CIR. R. 30.2's requirement to file an appendix containing the agency record, FGT requested the native Excel version, and PHMSA's appellate counsel has now supplied it (albeit only a locked-for-editing version that doesn't allow FGT to plug in corrected values in any of its cells, nor see the resulting impact on the penalty). Anyway, because the document isn't in PDF format, it cannot be filed through CM/ECF. With the agreement of PHMSA's appellate counsel, the native Excel version of this document and another Excel document listed as Doc. No. 33 have been separately supplied to the clerk's office so that the Court has access to them. *See* App. Index at nn.2-3.

Consider the following example from the worksheet's native Excel version that PHMSA made available *after* FGT filed its petition for review with this Court.

```
=ROUNDUP((40+MIN(MAX((E28-1),0),20)*8+MIN(MAX((E28-21),0),20)*4+MIN(MAX(E28-41,0)
```

```
,40)*2+MIN(MAX(E28-81,0),80)*1+MAX(E28-161,0)*0.5)*E29/40,2)
```

A.5 (cell E39). We had to break the screen captures above into two lines because FED. R. APP. P. 32(a)(4)'s 8½-inch page width specification otherwise made this formula nearly illegible. It depicts the algorithm for cell E39: "Total gravity points" for Item 3. PHMSA's position is that this formula was obvious from the information it provided. Hardly.

This is no nitpicking concern. A federal district court decision from the District of Columbia explains why a regulated carrier's access to the actual algorithms is critical. *Don Ray Drive-A-Way Co v. Skinner*, 785 F. Supp. 198, 199 (D.D.C. 1992). There, the court found that the Federal Highway Administration ("FHWA") was obligated to disclose to the public the algorithm it used to compute motor carrier safety ratings. As the court described, although the FHWA provided motor carriers with a series of factors on which their safety performance was judged, FHWA refused to explain how it weighed each factor. *Id.* at 200.

Rejecting that position as interfering with regulated carriers' rights to have access to information that "controls final agency action subject to review," *Don Ray* concludes that understanding exactly how FHWA was "weighting" the various factors is "crucial to the carriers' understanding of why they are being assigned a particular legal status." *Id.* "Without that information, their right to appeal the agency action is severely impaired, in that they will not know the reason for their rating and hence cannot direct their attack to facts crucial to a successful appeal." *Id.* That makes sense. As the court reasoned, "A person should not have to guess why he is being punished, even if the government ultimately says that the punishment is attributable to one or more of several reasons." *Id.*

Here, too, the refusal to give FGT access to the algorithms deprives it of a full understanding of how points are being assessed in the civil-penalty worksheet. The ability of FGT's counsel to reverse-engineer a few fields on the worksheet is no substitute for access to the algorithms themselves. FGT couldn't fully prepare for the hearing and defend itself in this enforcement proceeding. It couldn't effectively and meaningfully question the agency witnesses to defend itself against the algorithm's calculations or against any potential keystroke errors. A.2540 (RE6:15). Indeed, even the hearing presiding official acknowledged that the data keyed into the proposed civil-penalty worksheet here could contain a keystroke error. *Id.*

*✻*

FGT's due-process rights to a full and fair adjudication demand more.  If the Court doesn't set aside the violations, FGT should be afforded its rights to "all agency records pertinent to the matters of fact and law asserted."  49 U.S.C. § 60117(b)(1).  This Court should remand for a new hearing so that the agency's decision can be made on a complete record.

## IV. The civil penalty for Item 3 is excessive because it was increased based on an unsupported causal relationship with the incident.

If this Court vacates the violation found for Item 3, then it need not reach this issue.  PHMSA's penalty calculation for Item 3 was premised in part on PHMSA's finding of a causal relationship between FGT's 2019 tool selection and the Sanford Lateral rupture.  But that causal relationship was non-existent.  A.2938-39.

In determining the penalty amount, PHMSA is directed by statute to consider several factors, including the nature, circumstances, and gravity of the violation— including adverse environmental impact, the violator's degree of culpability, any prior-violation history, and any effect on ability to continue doing business—and the violator's good faith in attempting to comply.  *See* 49 U.S.C. § 60122(b).  In assessing the $362,800 penalty for Item 3, PHMSA applied these factors.  Just before discussing the culpability and good-faith factors, the final order discussed its application of the gravity factor:

55

With respect to gravity, FGT argued that its failure to use an ILI tool with axial capability in 2019 was not a causal factor in the September 10, 2020 incident. However, I find that Respondent's failure to use the appropriate assessment methods was a causal factor in the failure because the rupture occurred in the longitudinal seam and FGT failed to use the appropriate tool in 2019 to address longitudinal seam failure, an axial defect.

A.2938-39 (footnote omitted).

In the appended footnote, the final order cites page 4 of the root cause failure analysis report, A.2939 (citing A.67), presumably referring to the following sentence from that report: "The failure initiated in the longitudinal seam of the pipe where it caused a rupture of nearly the entire joint length and arrested in both directions in the pipe body." A.67. But that sentence supplies no support for the conclusion the final order draws from it (that an MFL-C tool would've detected an axial defect).

The root cause failure analysis report discloses, and PHMSA apparently agreed, that the Sanford Lateral rupture was caused by stress-corrosion cracking. A.29, 73, 2930-33. But stress-corrosion cracking is a different animal altogether. Stress-corrosion cracks on pipelines form and grow on the pipe's external surface.[29] Stress-corrosion cracking isn't itself a *seam* defect. Merely because external corrosion is found "on the long seam" doesn't change the analysis—especially not

---

[29] *See* https://bit.ly/42iOvKV.

the corrosion found here that was old and had been arrested. A.73, 76-77. Plus, here, "[t]here was no evidence of notable internal corrosion." A.73.

Ultimately, there's no evidence that FGT's failure to use an MFL-C tool contributed to the incident. Even if FGT had (1) treated the Sanford Lateral as susceptible to seam failure, and (2) assessed the pipe with a method capable of assessing seam integrity under section 192.937(c)(1) and B31.82 section 6.2, PHMSA still failed to carry its burden to prove that FGT would've discovered the specific defect in the Sanford Lateral that caused the rupture.

It gets worse. PHMSA's unsupported causal-factor finding overlooks an important limitation. Section 192.937(c)'s provisions requiring that an operator assess the pipeline's integrity—part of the integrity-management regulations in Subpart O of Part 192—apply only to "covered segment[s]." 49 C.F.R. § 192.937(c). The same is true for subsection (c)(1)'s provisions requiring that an operator follow B31.8S section 6.2 "in selecting the appropriate internal inspection tools"; it too applies only to covered segments. *Id.* § 192.937(c)(1). But the incident location was not in a high-consequence area. A.728; 49 C.F.R. § 192.903. The joint of pipe that ruptured was thus not on a covered segment. 49 C.F.R. § 192.303 ("Covered segment or covered pipeline segment means a segment of gas transmission pipeline located in a high consequence area."). There's no evidence of

57

any causal relationship between what FGT did or didn't do in covered segments, on the one hand, and the incident location in a non-covered segment, on the other hand.

To illustrate, assume PHMSA is correct that section 192.937(c)(1) required FGT's use of an MFL-C tool for LF-ERW pipe. Even then, section 192.937(c)(1) would've obligated FGT to run the MFL-C tool to assess only covered segments. It would be pure speculation to assume that FGT would've run such a tool on non-covered segments—well beyond the regulation's minimum-safety standards. But the regulations don't impose that requirement. And the evidence doesn't support PHMSA's speculation.

PHMSA thus acted contrary to the evidence before it and in an arbitrary-and-capricious manner when it determined that running the MFL-C tool would've found what caused the rupture (stress-corrosion cracking) in a non-covered segment and that FGT's tool choice was the cause of a non-seam-defect-related failure. Because PHMSA erred in increasing the assessed penalty for Item 3 on the ground that FGT's 2019 tool selection was a "causal factor" in the incident, the assessed penalty cannot stand.

On that front, when a "violation was a causal factor in a reportable accident/incident," the civil-penalty worksheet value for "gravity" is 60 points. A.2; A.5 (cells A29, B29). Without PHMSA's unwarranted increase of the gravity

points premised on its incorrect causal-factor finding, the gravity points would total only one. A.2; A.5 (cells A33, B33). So that error would need to be corrected. A few other adjustments and corrections would also need to be made:

- **Cell E80:** Change the factor in cell E80 from a 2 to a 1 because the 2019 tool selection was not a causal factor of an incident.

- **Cell E83:** Change the factor in cell E83 from a 1.5 multiplier to a 1 because the 2109 tool selection was not a causal factor of an incident.

- **Cell E28:** Change the number of violations for Item 3 in cell E28 to eliminate, as PHMSA concedes, the alleged violation for the 2014 tool run, A.2939, by changing cell E28 from a 2 to a 1.

The algorithms should adjust the net result in cells E87 and E93. A.3; A.5 (cell 87E); *see also supra* p. 51 n.28. Accordingly, if this Court doesn't vacate the violation found on Item 3, then this Court should remand to the agency to reevaluate the appropriate penalty for Item 3 in light of this determination.

## Conclusion

Petitioner requests that this Court hold unlawful, vacate, enjoin, and set aside the final order—overturning the violations on Items 1 and 3 found by PHMSA and order that PHMSA reimburse that portion of the penalty FGT paid. In the alternative, Petitioner requests that the Court remand the action to PHMSA to

remedy the due-process violations and to reopen the hearing. In the further alternative, Petitioner requests that this Court remand to PHMSA to recalculate the amount of the civil penalty imposed for Item 3 and order that PHMSA reimburse the portion of the penalty FGT paid that exceeds the adjusted penalty. Petitioner requests any other relief as may be appropriate.

Respectfully submitted,

*s/ Dana Livingston*
Dana Livingston
dlivingston@cokinoslaw.com
COKINOS YOUNG, P.C.
900 S. Capital of Texas Hwy.
Suite 425
Austin, TX 78746
Telephone: (512) 482-9304
Facsimile: (512) 610-1184

William V. Murchison
Vince.Murchison@PipelineLegal.com
Haley O'Neill
Haley.Oneill@pipelinelegal.com
Roina Rivera Baker
Roina.Baker@PipelineLegal.com
MURCHISON O'NEILL, PLLC
325 N. St. Paul Street
Suite 2700
Dallas, Texas 75201
Telephone: (214) 716-1923
Facsimile: (844) 930-0089

*Counsel for Petitioner Florida Gas Transmission Company, LLC, a subsidiary of Energy Transfer LP*

**Certificate of Service**

I certify that on January 27, 2025, a copy of the foregoing document was filed and served electronically through the Court's Electronic Case Filing System on lead counsel of record for Petitioners:

Brian James Springer
brian.j.springer@usdoj.gov
Casen Ross
casen.ross@usdoj.gov
civilappellate.ecf@usdoj.gov
U.S. Department of Justice
Civil Division, Appellate Section
950 Pennsylvania Avenue, N.W.
Room 7270
Washington, DC 20530


*Counsel for Respondents*


*s/ Dana Livingston*
Dana Livingston

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), this document contains <u>12,954</u> words.

2.    This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365, in 14 point Equity, except for footnotes, which are in 12 point Equity, as permitted by 5TH CIR. R. 32.1.

<u>*s/ Dana Livingston*</u>
Dana Livingston